## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| BISCUIT CAFE, INC., d/b/a Buttermilk Geneva, BUTTERMILK NAPERVILLE, INC., d/b/a Buttermilk, BM VERNON, INC., d/b/a Buttermilk, HOBSON FINANCIAL GROUP OF ILLINOIS, INC., d/b/a Hollywood Boulevard Cinema, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>SOCIETY INSURANCE, INC., a Wisconsin corporation,<br><br>*Defendant.* | Case No. |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Biscuit Cafe, Inc. ("Buttermilk Geneva"), Plaintiff Buttermilk Naperville, Inc. ("Buttermilk Naperville"), Plaintiff BM Vernon, Inc. ("Buttermilk Vernon Hills"), and Plaintiff Hobson Financial Group of Illinois, Inc. d/b/a Hollywood Boulevard Cinema ("Hollywood Boulevard Cinema") (collectively, "Plaintiffs"), bring this Class Action Complaint and Demand for Jury Trial against Defendant Society Insurance, Inc. ("Defendant" or "Society Insurance") for wrongfully denying their claims for business income and extra expense coverage resulting from losses sustained due to the ongoing COVID-19 pandemic. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

### NATURE OF THE ACTION

1.      Plaintiff Buttermilk Geneva and Plaintiff Buttermilk Naperville have operated restaurants located in Geneva, Illinois and Naperville, Illinois since 2015 and 2018, respectively.

Due to the success of these two restaurants, a third location, Buttermilk Vernon Hills located in Vernon Hills, Illinois, was set for a grand opening on April 20, 2020 (these three Plaintiffs are referred to collectively as "Buttermilk"). Unfortunately, due to the COVID-19 pandemic and recent executive orders issued by the Governor of the State of Illinois (the "Closure Orders," defined below),[1] Buttermilk has been unable to open Buttermilk Vernon Hills and has been forced to close Buttermilk Geneva and Buttermilk Naperville to the public—through no fault of their own—as part of the State's efforts to address the spread of the COVID-19 global pandemic. The Closure Orders have required Buttermilk Geneva and Buttermilk Naperville to cease all of their operations except for their limited pick-up and delivery services, since they are considered "Essential Businesses" by the State. This business interruption has resulted in catastrophic business income loss and significant extra expense.

2.       Plaintiff Hollywood Boulevard Cinema has operated a movie theater and full-service restaurant in Woodridge, Illinois since 2014. Unfortunately, due to the COVID-19 pandemic and the Closure Orders, Hollywood Boulevard Cinema has been forced to completely cease its operations—also through no fault of its own—as part of the State's efforts to address the spread of the COVID-19 global pandemic. The Closure Orders have required Hollywood Boulevard Cinema to cease 100% of its business operations because, as a movie theater, it is considered a "Non-Essential Business" by the State. The closure of Hollywood Boulevard Cinema's movie theater and restaurant has resulted in a total loss of actual business income and significant extra expense.

3.       To protect their businesses in situations like these, Plaintiffs obtained identical

---

[1]       *See* Ill. Executive Order 2020-07 (March 16, 2020), Ill. Executive Order 2020-10 (March 20, 2020), & Ill. Executive Order 2020-19 (April 1, 2020) (hereinafter, the "Closure Orders"). The Closure Orders are attached as Exhibits A through C.

business interruption insurance policies from Defendant, which include special property coverage, as set forth in Society Insurance's Businessowner's Special Property Coverage Form, Form TBP2 05-15 (the "Special Property Coverage Form"). The Special Property Coverage Form provides, *inter alia*, "Business Income" coverage, "Extra Expense" coverage, "Civil Authority" coverage, and "Contamination" coverage, in the event Plaintiffs incur losses and extra expenses due to an involuntary business interruption.

4.      However, in blatant breach of the insurance obligations that Defendant voluntarily undertook in exchange for Plaintiffs' premium payments, Defendant has issued blanket denials to Plaintiffs for any business income losses or other covered expenses related to COVID-19 or the Closure Orders, without first conducting a meaningful coverage investigation.

5.      As a result of Defendant's wrongful denial of coverage, Plaintiffs bring this action, on behalf of themselves and all those similarly situated, for declaratory judgement establishing that the COVID-19 pandemic and corresponding response by civil authorities trigger coverage under the Special Property Coverage Form; for breach of Defendant's contractual obligation under the Special Property Coverage Form to indemnify Plaintiffs and others similarly situated for business income losses and extra expenses; and for bad faith claims handling pursuant to 215 ILCS 5/155.

**PARTIES**

6.      Plaintiff Biscuit Cafe, Inc., d/b/a Buttermilk Geneva, is a corporation incorporated and existing under the laws of the State of Illinois with its principal place of business located at 7 West State Street, Geneva, Illinois 60134.

7.      Plaintiff Buttermilk Naperville, Inc., d/b/a Buttermilk, is a corporation incorporated and existing under the laws of the State of Illinois with its principal place of

business located at 1715 Freedom Drive, Naperville, Illinois 60563.

8.     Plaintiff BM Vernon, Inc., d/b/a Buttermilk, is a corporation incorporated and existing under the laws of the State of Illinois with its principal place of business located at 925 North Milwaukee Avenue, Unit 100, Vernon Hills, Illinois 60061.

9.     Plaintiff Hobson Financial Group of Illinois, Inc., d/b/a Hollywood Boulevard Cinema is a corporation incorporated and existing under the laws of the State of Illinois with its principal place of business located at 1001 West 75th Street, Woodridge, Illinois 60517.

10.    Defendant Society Insurance, Inc. is a corporation incorporated and existing under the laws of the State of Wisconsin with its principal place of business in Fond du Lac, Wisconsin. Defendant is an insurance company engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Illinois and elsewhere, and otherwise conducts business throughout this District, the State of Illinois, and the United States.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that section apply.

13.    This Court has personal jurisdiction over Defendant pursuant to Illinois' "long arm statute," 735 ILCS 5/2-209, because Defendant has submitted to jurisdiction in this state by: (a) transacting business in Illinois; (b) contracting to insure a person, property, or risk located

within Illinois at the time of contracting; and (c) making a contract substantially connected with Illinois. *See* 735 ILCS 5/2-209(1), (4), (7). In addition, Defendant exercises substantial, systematic and continuous contacts with Illinois by doing business in Illinois, serving insureds in Illinois, and seeking additional business in Illinois.

14.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the Policies with respect to the loss of business income and extra expense arising from the events detailed herein.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred within the Northern District of Illinois.

## FACTUAL BACKGROUND

### I.     The Society Insurance All-Risk Policy.

16.     Defendant issued to Buttermilk Geneva Policy No. BP18043694-1 for the policy period between January 28, 2020 to January 28, 2021.

17.     Defendant issued to Buttermilk Vernon Hills Policy No. BP19030075-0 for the policy period between August 15, 2019 to August 15, 2020.

18.     Defendant issued to Buttermilk Naperville Policy No. BP18044835-3 for the policy period between December 28, 2019 to December 28, 2020.

19.     Defendant issued to Hollywood Boulevard Cinema Policy No. BP15029440-4 for the policy period between November 1, 2019 to November 1, 2020.

20.     In exchange for substantial premiums, Defendant sold Plaintiffs identical versions of the Special Property Coverage Form, which include several additional coverages, including

"Business Income," "Extra Expense," "Civil Authority," and "Contamination" coverages. Each Plaintiff's Special Property Coverage Form is included within the policies attached as Exhibits D-G (together, the "Policies").

21.     The Policies were issued to Plaintiffs and cover their premises located at the addresses listed above.

22.     Plaintiffs have performed all of their obligations under the Policies, including the payment of premiums.

23.     The Policies are "all-risk" policies, meaning that the Policies cover any loss unless the Policies contain a provision expressly excluding the loss from coverage.

24.     The Policies do not exclude losses from viruses or pandemics. Thus, the Policies purchased by Plaintiffs cover property damage and business losses caused by viruses, such as COVID-19.

25.     Under the Special Property Coverage Form, Defendant agreed to "pay for the actual loss of Business Income" sustained by Plaintiffs "due to the necessary suspension" of Plaintiffs' operations during the period of business interruption caused "by direct physical loss of or damage to covered property" at Plaintiffs' premises. (*See* Special Property Coverage Form, § A.5.g.) "Suspension" under the Business Income coverage means: (1) "the partial slowdown or complete cessation of your business activities;" or (2) "that a part or all of the described premises is rendered untenantable if coverage for Business Income applies." (*See id.*, § A.5.g.(3).) "Business Income" is defined in relevant part as "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred" plus "continuing necessary operating expenses incurred." (*See id.*, § A.5.g.(1)(c).)

26.     Under the Special Property Coverage Form, Society Insurance also promised to

"pay necessary Extra Expense" Plaintiffs incur during the period of interruption that they "would not have incurred if there had been no direct physical loss or damage to covered property at the described premises." (*See id.*, § A.5.h.) "Extra Expense" is defined in relevant part as any expense incurred (i) "[t]o avoid or minimize the suspension of business and to continue operations at the described premises"; (ii) "[t]o minimize the suspension of business if [Plaintiffs'] cannot continue operations"; or (iii) "to [r]epair or replace any property[.]" (*See id.*, § A.5.h.(2).)

27.     The Special Property Coverage Form also provides "Civil Authority" coverage, pursuant to which Society Insurance promised to pay for Plaintiffs' loss of Business Income and Extra Expense "caused by action of civil authority that prohibits access" to the insured premises. (*See id.*, § A.5.k.) This Civil Authority coverage is triggered when any non-excluded cause results in "damage to property other than property" at Plaintiffs' insured premises, and is intended to cover losses resulting from governmental actions "taken in response to dangerous physical conditions." (*See id.*, § A.5.k.(2).)

28.     The Special Property Coverage Form also provides "Contamination" coverage, pursuant to which Society Insurance promised to pay for Plaintiffs' (i) "costs to clean and sanitize [Plaintiffs'] premises, machinery, and equipment," and (ii) loss of Business Income and Extra Expense due to "Contamination." (*See id.*, § A.5.m.) "Contamination" means "a defect, deficiency, inadequacy or dangerous condition in your products, merchandise or premises." (*See id.*, § A.5.m.(4)(a).* "Contamination" coverage for Business Income and Extra Expense is triggered in a variety of circumstances, including "an action by a public health or other governmental authority that prohibits access to [Plaintiffs'] premises" and adverse "publicity" resulting from the discovery or suspicion of "Contamination." (*See id.*, § A.5.m.(2).)

29.     Damage caused by COVID-19 and the related Closure Orders triggered the Business Income, Extra Expense, Civil Authority, and Contamination coverages provided by the Special Property Coverage Form.

## II.     The COVID-19 Pandemic.

30.     For years, if not decades, the Center for Disease Control and the World Health Organization have been warning about the possibility of an airborne virus that could cause a worldwide pandemic.

31.     COVID-19 is a highly contagious airborne virus that has rapidly spread and continues to spread across Illinois and the United States.

32.     COVID-19 is a physical substance and an organic human pathogen that travels through respiratory droplets. The virus physically transforms the air exposed to it and attaches itself to surfaces and structures.

33.     The COVID-19 virus spreads primarily by "fomite"—meaning objects, materials, or surfaces that have been physically contaminated or infected by respiratory droplets—and can survive on surfaces for extended periods of time. Recent information on the CDC's website provides that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.[2]

34.     According to a scientific study in The New England Journal of Medicine, the coronavirus responsible for the COVID-19 disease—SARS-CoV-2—can physically infect and

---

[2] *How COVID-19 Spreads*, Ctr. for Disease Control and Prevention (April 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html

survive on surfaces for up to 72 hours.[3]

35.    Another scientific study documented in the Journal of Hospital Infection found that human coronaviruses, such as COVID-19, can remain infectious on inanimate surfaces at room temperature for up to nine days.[4]

36.    To date, tens of thousands of people in Illinois have been diagnosed with COVID-19, and it is likely that hundreds of thousands (if not millions) more have been infected by COVID-19 but have not been diagnosed. While in some cases asymptomatic, COVID-19 is also known to cause severe and sometimes fatal respiratory failure. This, in addition to the highly contagious nature of COVID-19, renders any property exposed to the contagion unsafe and dangerous.

37.    On March 11, 2020, the World Health Organization declared that the emerging threat of COVID-19 constituted a global pandemic.[5]

38.    While some rogue media outlets have downplayed the danger and impact of the COVID-19 pandemic, the scientific community and those personally and professionally affected by the virus recognize COVID-19 as a cause of real physical loss and damage. Recently, the Pennsylvania Supreme Court found that the COVID-19 pandemic constitutes a "natural disaster," namely because, like other identified natural disasters, it involves "substantial damage

---

[3] Neeltje van Doremalen, Ph.D., et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, The New England Journal of Medicine (April 16, 2020), available at https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973?articleTools=true.

[4] *See* G. Kampf, et al. *Persistence of coronavirus on inanimate surfaces and their inactivation with biocidal agents* (February 06, 2020), available at https://www.journalofhospital infection.com/action/showPdf?pii=S0195-6701%2820%2930046-3

[5] *See WHO Director-General's opening remarks at the media briefing on COVID-19*, World Health Organization (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020

to property, hardship, suffering or possible loss of life." *Friends of DeVito v. Wolf*, No. 68 MM 2020, 2020 WL 1847100, at 10 (Pa. Apr. 13, 2020).

### III.     The Closure Orders and Other Action by Governmental Authorities.

39.     In response to the COVID-19 pandemic, the Governor of Illinois, J.B. Pritzker, has issued multiple executive orders pursuant to the authority vested in him by the Illinois Constitution and the laws of Illinois. Similarly, City of Chicago Mayor, Lori E. Lightfoot, Village of Woodridge, Illinois Mayor, Gina Cunningham, and numerous other officials across the State have issued orders in response to COVID-19, pursuant to their respective authorities.

40.     On March 9, 2020, Governor Pritzker declared all counties in the State of Illinois as a disaster area, specifically "in response to the outbreak of COVID-19." On April 1, Governor Pritzker again declared all counties in the State of Illinois as a disaster area, specifically "in response to the exponential spread of COVID-19."[6]

41.     On March 16, 2020, during the term of the Policies issued by Society Insurance to Plaintiffs, and pursuant to the Illinois Emergency Management Agency Act, 20 ILCS 3305/1, *et seq.*, Governor Pritzker issued Executive Order 2020-07, requiring "all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores and food halls—[to] suspend service for and . . . not permit on-premises consumption."[7] The March 16th Closure Order also prohibited all public and private gatherings of 50 people or more, including non-essential venues such as "fitness centers/health clubs, bowling alleys, private clubs, and theatres." (*Id.*)

---

[6] Ill. Executive Order 2020-19 (April 1, 2020).

[7] Ill. Exec. Order 2020-07 (March 16, 2020). A copy of the March 16th Closure Order is attached as Exhibit E.

42.     This Closure Order was in direct response to the " COVID-19 outbreak" and the physical presence of COVID-19 on property throughout the State of Illinois. It specifically stated that the goal was to respond to the rapid spread of COVID-19 by restricting in-person interactions in environments with "frequently used services in public settings, including bars and restaurants…" The March 16th Closure Order also specifically stated that "the ongoing spread of COVID-19 and the danger the virus poses to the public's health and wellness require the reduction of on-premises consumption of food and beverages." The March 16th Closure Order thus recognized that the spread of COVID-19 throughout Illinois could not be sufficiently abated by cleaning and disinfecting frequently used surfaces in public settings; it mandated that access to such surfaces be suspended altogether.

43.     On March 16, 2020, Mayor Lightfoot issued guidance for restaurants and bars to comply with the Governor's Closure Order. That guidance barred "the consumption of food or beverage. . . inside [any] restaurant or bar" and the congregation of persons "inside or outside [any] restaurant or bar." At "midnight" Chicago would begin "any necessary enforcement measures."[8]

44.     On March 20, 2020, in response to the rapid spread of COVID-19 in the Greater Chicago Area and throughout Illinois, Governor Pritzker issued Executive Order 2020-10, which (1) directed Illinois residents to stay in their homes except when performing "essential" activities, (2) prohibited gatherings of 10 or more people, and (3) required "non-essential" businesses to cease operations. Ill. Exec. Order 2020-10 (March 20, 2020).[9] On April 1, 2020,

---

[8]     Press Release, City of Chicago, City of Chicago Issues Guidance and Support for Covid-19 Restrictions on Restaurant Dining and Taverns (Mar. 16, 2020).

[9]     Ill. Executive Order 2020-10 (March 20, 2020). A copy of the March 20th Closure Order is attached as Exhibit F.

Governor Pritzker extended that Closure Order until April 30, 2020, stating that "in a short period of time, COVID-19 has rapidly spread throughout Illinois."[10] The March 20th and April 1st Closure Orders were again in direct response to the continued and increasing presence of COVID-19 at property on or around Plaintiffs' premises.

45.     On March 25, 2020, Mayor Lightfoot issued a press release reminding Chicagoans of the "critical importance" of complying with the Governor's stay-at-home order. The press release noted that the Chicago Police Department is "empowered to enforce the Governor's order through citations and additional measures."[11]

46.     The Governor of the State of Illinois and the Mayor of Chicago are civil and/or governmental authorities as contemplated by the Policies.

47.     At the time the Closure Orders were issued, civil authorities had confirmed that properties and premises throughout Illinois contained COVID-19 particles on surfaces and items of property.

48.      Other governmental authorities and public health officials around the country have similarly acknowledged that the spread of COVID-19 causes direct physical loss and damage to property. For example:

      a.      The State of Colorado issued a public health order indicating that "COVID-19 … **physically contributes to property loss, contamination, and damage**…" (Emphasis added);

      b.      The City of New York issued an emergency executive order in response to COVID-19 and the pandemic, in part "because **the virus physically is**

---

[10]     Ill. Exec. Order 2020-19 (April 1, 2020). A copy of the April 1st Closure Order is attached as Exhibit G.

[11]     Press Release, City of Chicago, Mayor Lightfoot Reminds Residents of Critical Importance of Staying at Home to Prevent Further Spread of Covid-19 (Mar. 15, 2020).

**causing property loss and damage**.” (Emphasis added);

c.    Broward County, Florida issued an emergency order acknowledging that COVID-19 “**is physically causing property damage**.” (Emphasis added);

d.    The State of Washington issued a stay at home proclamation stating the “COVID-19 pandemic and its progression … remains a public disaster affecting life, health, [and] **property**…” (Emphasis added);

e.    The State of Indiana issued an executive order recognizing that COVID-19 has the “propensity to **physically impact surfaces and personal property**.” (Emphasis added);

f.    The City of New Orleans issued an order stating “there is reason to believe that COVID-19 may spread amongst the population by various means of exposure, including the propensity to attach to surfaces for prolonged period of time, thereby spreading from surface to person and **causing property loss and damage** in certain circumstances.” (Emphasis added);

g.    The State of New Mexico issued a public health order acknowledging the “threat” COVID-19 “poses” to “**property**.” (Emphasis added);

h.    North Carolina issued a statewide executive order in response to the COVID-19 pandemic not only “to assure adequate protection for lives,” but also to “assure adequate protection of… **property**.” (Emphasis added); and

i.    The City of Los Angeles issued an order in response to COVID-19 “because, among other reasons, the COVID-19 virus can spread easily from person to person and it is **physically causing property loss or damage** due to its tendency to attach to surfaces for prolonged periods of time.” (Emphasis added).

49.    As these orders all recognize, the presence of people infected with or carrying COVID-19 particles throughout the state in places, like Plaintiffs’ insured premises, where public gatherers typically socialize, eat, drink, or use for entertaining or other recreation renders those places unsafe and unusable. The Closure Orders were issued in direct response to these existing dangerous physical conditions.

**IV.    Plaintiffs’ Losses Due to the COVID-19 Pandemic and Resulting Closure Orders.**

50.    Buttermilk Geneva, Buttermilk Naperville, and Buttermilk Vernon Hills are

considered "Essential Businesses" pursuant to the March 20th and April 1st Closure Orders.

51.     Hollywood Boulevard Cinema is considered a "Non-Essential Business" pursuant to the March 20th and April 1st Closure Orders.

52.     As a result of the Closure Orders, on March 17, 2020, Buttermilk was required to close its restaurants to the public and only prepare and serve food for consumption off-premises. Hollywood Boulevard Cinema was required to cease its business operations completely.

53.     The Closure Orders prohibit the public from accessing Plaintiffs' insured premises described in the Policies, thereby causing the necessary suspension of their operations and triggering the Business Income, Extra Expense, Civil Authority, and Contamination coverages under the Policies.

54.     Moreover, the continuous presence of COVID-19 on or around Plaintiffs' premises has damaged property by infecting it and has rendered the premises unsafe, uninhabitable, and unfit for their intended use.

55.     Upon information and belief, people carrying COVID-19 particles in, on, or about their person, have been physically present at or around Plaintiffs' insured premises during the time the Policies were in effect.

56.     Upon information and belief, COVID-19 particles have been physically present at or around Plaintiffs' insured premises—both airborne and on surfaces and items of property at or around Plaintiffs' premises—during the time the Policies were in effect and remained physically present for up to 28 days.

57.     Plaintiffs have sustained direct physical loss and damage to items of property located at their premises and direct physical loss and damage to their premises described in the Policies as a result of the presence of COVID-19 particles and/or the COVID-19 pandemic. The

14

presence of COVID-19 caused direct physical loss of and/or damage to the premises insured under the Policies by, among other things, damaging the property, denying access to the property, preventing customers from physically occupying the property, causing the property to be physically uninhabitable by customers, causing its function to be nearly eliminated or destroyed, and/or causing a suspension of business operations on the premises.

58. The presence of COVID-19 particles also constitutes a "contamination," as defined by the Policies.

59. Plaintiffs have incurred substantial Business Income losses and Extra Expense caused by: (i) the presence of COVID-19 at or around Plaintiffs' insured premises, (ii) the Closure Orders which prohibit access to Plaintiffs' insured premises or the production of Plaintiffs' products, and (iii) publicity resulting from the discovery or suspicion of a COVID-19 contamination.

**V.    Society Insurance's Denial of Plaintiffs' Claims for Coverage,**

60. Following the March 16, 2020 Closure Order, Plaintiffs, like countless other Illinois businesses, submitted timely insurance claims to Society Insurance requesting coverage for their business interruption losses and extra expenses promised under the Policies.

61. On April 1, 2020, Society Insurance denied Hollywood Boulevard Cinema's claim in writing. (*See* April 1, 2020 Denial Letter, attached hereto as Exhibit H.)

62. On March 25, 2020, Buttermilk submitted a written claim to Society Insurance. (*See* March 25, 2020 Claim Letter, attached hereto as Exhibit I.) Society Insurance effectively denied Buttermilk's claim by failing to respond for nearly one month.

63. Upon information and belief, Society Insurance has uniformly refused to provide Business Income, Extra Expense, Civil Authority, Contamination, or any other coverage to most,

if not all, Illinois businesses that have claimed business interruption losses and/or extra expense under the Special Property Coverage Form as a result of COVID-19 and the Closure Orders.

64.     Defendant issued its denials or otherwise refused to respond to policyholder claims without first conducting a meaningful coverage investigation, let alone a "reasonable investigation based on all available information," as Illinois law requires.

65.     In fact, on March 16, 2020, before Plaintiffs had submitted their claims to Society, the CEO of Society Insurance circulated a memorandum to its "agency partners," acknowledging that states, such as Illinois, had "taken steps to limit operations of certain businesses," but prospectively concluding that Society Insurance's policies would likely not provide coverage for losses due to a "governmental imposed shutdown due to COVID-19 (coronavirus)." Upon information and belief, Defendant also instructed insurance brokers to discourage policyholders from filing claims and promulgated the false conclusion that no coverage was available under the Special Property Coverage Form.

66.     To the extent Defendant has provided any reason to Plaintiffs for its categorical denial of Plaintiffs' claims, it is based on Defendant's assertions (i) that the "actual or alleged presence of coronavirus," does not constitute "direct physical loss or damage" and (ii) that "no government authority has prohibited access" to Plaintiffs' premises because of a "contamination" as defined by the Policies. (*See* Exhibit H.)

67.     However, Defendant's statement that the alleged or actual presence of a substance like COVID-19 does not result in property damage is contrary to Illinois law: the presence of a dangerous substance in a property constitutes "physical loss or damage." *See, e.g., Bd. Of Educ. Of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co.*, 720 N.E.2d. 622, 625-26 (Ill. Ct. App. 1999), *as modified on denial of reh'g* (Dec. 3, 1999).

68.     Defendant likewise provided no basis for its conclusion that the presence of COVID-19 in or around Plaintiffs' premises is not a "contamination" under the Policy, i.e., a "dangerous condition" in Plaintiffs' "products, merchandise, or premises." (*See* Exhibit H.)

69.     Finally, unlike many commercial property policies available on the market, the "all-risk" Policy that Defendant sold to Plaintiffs does not exclude loss caused by a virus. Thus, Plaintiffs reasonably expected that the insurance they purchased from Defendant included coverage for property damage and business interruption losses caused by viruses like COVID-19.

70.     Defendant could have excluded pandemic-related losses under the Special Property Coverage Form or another endorsement to the Policies, as other insurers regularly do. In 2006, the ISO drafted a new endorsement, CP 01 40 07 06, acknowledging that claims for business interruption losses would be filed under existing policy language for losses resulting from the presence of disease-causing agents. Endorsement CP 01 40 07 06, which other insurers have since incorporated in policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Defendant did not include any language to this effect in the Special Property Coverage Form, nor did it include this endorsement in any of the Policies.

71.     Instead, Defendant waited until after it collected Plaintiffs' premiums, and after a pandemic and the resulting Closure Orders caused catastrophic business losses to Plaintiffs, to attempt to limit its exposure on the back-end through its erroneous assertion that the presence of COVID-19 is not a "physical loss or damage" or a "contamination" and is therefore not a covered cause of loss under its Policies.

72.     That the insurance industry has created and often uses specific exclusions for pandemic-related losses under similar commercial property policies undermines Defendant's claim that the presence of a virus, like COVID-19, does not cause "physical loss or damage" to property or constitute a "contamination" of the premises. Indeed, if a virus could not result in "physical loss" to property or a "contamination," such specific exclusions for pandemic or virus-related losses would be unnecessary.

73.     Moreover, Defendant's assertion ignores the coverage provided under the Policy's "Civil Authority" provision for losses incurred due to governmental actions "taken in response to dangerous physical conditions," even if those dangerous physical conditions cause damage to property at locations other than those insured under the Policies.

74.     Thus, Defendant's swift and wholesale denial of coverage is arbitrary, unreasonable, and inconsistent with the facts and plain language of the Policies. Defendant's denials appeared to be driven by Defendant's desire to reduce or extinguish its own financial exposure to the economic fallout caused by the COVID-19 crisis, rather than its obligation to initiate, as is its legal duty, a full and fair investigation of the claims and a careful review of the Policies it sold to Plaintiffs in exchange for valuable premiums.

## CLASS ALLEGATIONS

75.     **Class Definition:** Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), Plaintiffs bring this action on behalf of themselves and two classes of similarly situated individuals defined as follows:

> **Essential Business Class:** All persons and entities in Illinois that: (1) are considered "Essential Businesses or Operations" pursuant to Executive Order 2020-10; (2) have Business Income and Extra Expense coverage under Society Insurance policy form number "TBP2 05-15"; (3) have made a claim for lost Business Income and/or Extra Expense as a result of COVID-19 and the resultant Closure Orders; and (4) have been denied

18

coverage.

**Non-Essential Business Class:** All persons and entities in Illinois that: (1) are considered "Non-Essential Businesses or Operations" pursuant to Executive Order 2020-10; (2) have Business Income and Extra Expense coverage under Society Insurance policy form number "TBP2 05-15"; (3) have made a claim for lost Business Income and/or Extra Expense as a result of COVID-19 and the resultant Closure Orders; and (4) have been denied coverage.

The Essential Business Class and Non-Essential Business Class are referred to collectively as the "Classes." The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

76. **Numerosity:** The exact number of members of the Classes is unknown, but individual joinder in this case is impracticable. The Classes likely consist of thousands if not hundreds of thousands of members. Members of the Classes can be easily identified through Defendant's records.

77. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include but are not limited to the following:

    a. Whether Society Insurance issued all-risk insurance policies to Plaintiffs and

19

members of the Classes in exchange for payment of premiums by Plaintiffs and the Classes members;

b. Whether Plaintiffs and the Classes suffered a covered loss based on the common policies issued to Plaintiffs and members of the Classes;

c. Whether Society Insurance wrongfully denied all claims based on COVID-19;

d. Whether COVID-19 causes "direct physical loss or damage" to property;

e. Whether Society Insurance's Business Income coverage applies to a suspension of business caused by COVID-19;

f. Whether the Closure Orders constitute "action[s] of civil authority;"

g. Whether Society Insurance's Civil Authority coverage applies to a loss of Business Income caused by the Closure Orders requiring the suspension of business as a result of COVID-19;

h. Whether Society Insurance's Extra Expense coverage applies to efforts to minimize a loss caused by COVID-19;

i. Whether Society Insurance's Contamination coverage applies to a loss of Business Income and Extra Expense as a result of COVID-19;

j. Whether Society Insurance has breached its contracts of insurance through a blanket denial of all claims based on business interruption, income loss or closures related to COVID-19 and the Closure Orders; and

k. Whether Plaintiffs and the Classes are entitled to an award of reasonable attorney fees, interest and costs.

78. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Classes in that Plaintiffs and members of the Classes purchased identical insurance coverage

from Defendant containing identical language regarding business income losses and extra expense, their coverage claims for COVID-19 losses were denied by Defendant, and they have sustained damages arising out of Defendant's wrongful denials.

79.     **Adequate Representation:** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

80.     **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests:** Plaintiffs seek class-wide adjudication as to the interpretation, and resultant scope, of the Special Property Coverage Form. The prosecution of separate actions by individual members of the Classes would create an immediate risk of inconsistent or varying adjudications on this issue, which would establish incompatible standards of conduct for Defendants in evaluating future claims. Moreover, the adjudications sought by Plaintiffs could, as a practical matter, substantially impair or impede the ability of other Class members, who are not parties to this action, to protect their interests.

81.     **Declaratory and Injunctive Relief:** Defendant acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes.

82.     **Superiority:** This class action is appropriate for certification because class

proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. The prosecution of separate actions by individual members of the Classes would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**Declaratory Relief**
**(On behalf of Plaintiffs and the Classes)**

83.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

84.     Plaintiffs' Policies, as well as those of other members of the Classes, are insurance contracts under which Defendant was paid premiums in exchange for its promise to pay Plaintiffs' and the Classes' losses for claims covered by the Policies.

85.     Plaintiffs and other members of the Classes have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society Insurance, or Society Insurance is estopped from asserting them.

86.     Defendant has arbitrarily and without justification refused to reimburse Plaintiffs and members of the Classes for any losses incurred by them in connection with the covered business losses and extra expenses related to the Closure Orders and the necessary interruption of their businesses stemming from COVID-19.

87.      Society Insurance has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory

judgment.

88. An actual case or controversy exists regarding Plaintiffs' and the Classes' rights and Defendant's obligations under the Policies to reimburse Plaintiffs and the Classes for the full amount of losses incurred by Plaintiffs and the Classes in connection with the Closure Orders and the suspension of their businesses stemming from COVID-19.

89. Pursuant to 28 U.S.C. § 2201, Plaintiffs and the Classes seek a declaratory judgement from this Court declaring the following:

    a. Plaintiffs' and the Classes' losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Special Property Coverage Form;

    b. Society Insurance has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for Plaintiffs' and the Classes' losses by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and

    c. Society Insurance is obligated to pay Plaintiffs and the Classes for the full amount of the losses incurred and to be incurred in connection with the covered business losses related to the Closure Orders during period of restoration and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(On behalf of Plaintiffs and the Classes)**

90. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

91. Plaintiffs' Policies, as well as those of other members of the Classes, are insurance contracts under which Defendant was paid premiums in exchange for its promise to

pay Plaintiffs' and the Classes' losses for claims covered by the Policies.

92.     Plaintiffs and the Classes have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society Insurance, or Society Insurance is estopped from asserting them, yet Defendant has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

93.     By denying coverage for any business losses and extra expense incurred by Plaintiffs and the Classes in connection with the Closure Orders and the COVID-19 pandemic, Society Insurance has breached its coverage obligations under the Policies.

94.     As a result of Defendant's breaches of the policies, Plaintiffs and the Classes have sustained, and continue to sustain, substantial damages for which Defendant is liable, in an amount to be established at trial.

**THIRD CAUSE OF ACTION**
**Statutory Bad Faith Pursuant to 215 ILCS 5/155**
**(On behalf of Plaintiffs and the Classes)**

95.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

96.     Upon receipt of Plaintiffs' claims for coverage, Defendant immediately denied the claims without conducting any investigation, let alone a "reasonable investigation based on all available information" as required by Illinois law. *See* 215 ILCS 5/154, *et seq.*

97.     Upon information and belief, Defendant immediately and uniformly denied the members of the Classes' claims for coverage upon receipt without conducting any investigation, let alone a "reasonable investigation based on all available information" as required by Illinois law. *See* 215 ILCS 5/154, *et seq.*

98.     Defendant's denials were vexatious and unreasonable.

99.     Defendant's denials constitute "improper claims practices" under Illinois law—

namely Defendant's (1) refusals to pay Plaintiffs' and the Classes' claims without conducting reasonable investigations based on all available information and (2) failure to provide reasonable and accurate explanations of the bases in its denials. *See* 215 ILCS 5/154.6 (h), (n).

100.     Therefore, pursuant to 215 ILCS 5/155, Plaintiffs, on behalf of themselves and the Classes, request that, in addition to entering a judgement in favor of Plaintiffs and the Classes and against Defendant for the amount owed under the Policies at the time of judgement, the Court enter a judgement in favor of Plaintiffs and the Classes and against Defendant for an amount equal to the greater of (1) 60% of the amount which the trier of fact finds that Plaintiffs and the Classes are entitled to recover under the policies, exclusive of costs; and (2) $60,000 per Class member. *See* 215 ILCS 5/155.

101.     Plaintiffs further request, on behalf of themselves and the Classes, that the Court enter a judgement in favor of Plaintiffs and the Classes and against Defendant in an amount equal to all attorney fees and related costs, to be established at the conclusion of this action, incurred for the prosecution of this coverage action against Defendant, pursuant to 215 ILCS 5/155.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the other members of the Classes, respectfully request that the Court:

1.     Enter an order certifying the proposed Essential Business Class and Non-Essential Business Class, as defined above, designating Plaintiff Biscuit café, Inc., Plaintiff Buttermilk Naperville, Inc., and Plaintiff BM Vernon, Inc. as representatives of the Essential Business Class, designating Plaintiff Hobson Financial Group of Illinois, Inc. as representative of the Non-Essential Business Class, and appointing Plaintiffs' undersigned attorneys as Class

25

Counsel;

2.     Enter a declaratory judgement in favor of Plaintiffs and the Classes, and against Defendant, declaring as follows:

    a.  Plaintiffs' and the Classes' losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policies;

    b.  Society Insurance has waived any right it may have had to assert defenses to coverage, or otherwise seek to bar or limit coverage for Plaintiffs' and the Classes' losses, by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and

    c.  Society Insurance is obligated to pay Plaintiffs and the Classes for the full amount of the losses incurred, and to be incurred, in connection with the covered business losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from the COVID-19 pandemic;

3.     Enter a judgement on the Second Cause of Action in favor of Plaintiffs and the Classes, and against Defendant, and award damages for breach of contract in an amount to be established at trial;

4.     Enter a judgement on the Third Cause of Action in favor of Plaintiffs and the Classes, and against Defendant, in the amount equal to the greater of (1) 60% of the amount which the trier of fact finds that Plaintiffs and the Classes are entitled to recover under the Policies, exclusive of costs; and (2) $60,000 per Class member.

5.     Enter a judgement in favor of Plaintiffs and the Classes, and against Defendant, in

an amount equal to all attorney fees and related costs, to be established at the conclusion of this action, incurred for the prosecution of this coverage action against Defendant, pursuant to 215 ILCS 5/155.

6.      Award to Plaintiffs and the Classes pre- and post- judgment interest, to the extent allowable.

7.      Award to Plaintiffs such other and further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all issues so triable.

Respectfully submitted,

**BISCUIT CAFE, INC., BUTTERMILK NAPERVILLE, INC., BM VERNON, INC., and HOBSON FINANCIAL GROUP OF ILLINOIS, INC., individually and on behalf of all others similarly situated,**

Dated: April 23, 2020                  By: /s/ Benjamin H. Richman
                                              One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com
Theo Benjamin
tbenjamin@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Lily Hough
lhough@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300

Fax: 415.373.9435

David Fish
dfish@fishlawfirm.com
John Kunze
jkunze@fishlawfirm.com
THE FISH LAW FIRM, P.C.
200 East Fifth Avenue, Suite 123
Naperville, Illinois 60563
Tel: 630.355.7590
Fax: 630.778.0400
Firm ID: 44086